OPINION OF THE COURT
Gerald Lebovits, J.
I. Introduction
Petitioner cooperative corporation is the owner and landlord of a building located at 465 West 23rd Street, New York, New York. The corporation has a board of directors that oversees the building’s management. On July 9, 1993, respondent, Michael Davis, leased apartment 2F and bought the shares of stock appurtenant to the apartment.
Petitioner alleges that respondent engaged in objectionable conduct throughout his tenancy. Petitioner sent numerous warnings to respondent asking him to conform his conduct to the house rules. On December 6, 2001, the board of directors and respondent entered into a written agreement in which he promised to improve his behavior. Petitioner claims that respondent’s behavior worsened. On September 3, 2003, the board of directors held a special meeting to discuss whether respondent’s tenancy should be terminated for objectionable conduct under paragraph 31 (f) of the proprietary lease. Paragraph 31 (f) provides that:
“If at any time the Lessor shall determine, upon the affirmative vote of two-thirds of its then Directors, at a meeting duly called for that purpose, that because of objectionable conduct on the part of the Lessee, or of a person dwelling or visiting in the Apartment, repeated after written notice from Lessor, the tenancy of the Lessee is undesirable.”
Respondent attended the September 2003 special meeting. After the board members heard respondent defend himself, they unanimously voted to terminate his proprietary lease.
Petitioner now seeks possession of apartment 2F as well as use and occupancy and attorney’s fees. Petitioner moves for summary judgment, alleging that no issue of fact exists about whether the board voted properly to terminate respondent’s tenancy. Respondent, on the other hand, argues that tlie board’s vote is entitled to no deference under the business judgment rule. He argues, principally, that only a court, after a trial, can decide whether he engaged in objectionable conduct. He does not suggest, however, that the board vote was outside the scope of its authority, that the board’s decision was invalid or made in *602 bad faith, or that in voting as it did the board did not further the cooperative’s corporate purpose.
Given the board vote in this case, the court is called upon in this holdover proceeding to resolve an issue on which it reserved decision in 13315 Owners Corp. v Kennedy (4 Misc 3d 931 [Hous Part, Civ Ct, NY County 2004]). The court in Kennedy debated whether a trial court must adhere to the Court of Appeals’ dictum in 40 W. 67th St. v Pullman (100 NY2d 147 [2003]) that a vote of the cooperative’s board of directors, rather than only a shareholder vote, is entitled to business judgment deference that a shareholder-tenant is objectionable. (See Kennedy, 4 Misc 3d at 939-943.) The Kennedy court opined that Pullman’s language that a cooperative board can terminate a tenancy is dictum because Pullman was based on a shareholder vote, not a board vote (see id. at 939), and because Pullman was an eviction case, whereas the cases on which it relied were not (see id. at 940, citing Keith E. Sealing, 2002-2003 Survey of New York Law, Real Property Law, 54 Syracuse L Rev 1359, 1374 [2004]).
Because the board in Kennedy did not give the shareholder-tenant proper notice or a fair opportunity to be heard {id. at 948-949), did not vote in good faith {id. at 943), and acted outside the scope of its authority {id.), the court found that the cooperative corporation was not entitled to Pullman deference (see id. at 949-950). The Kennedy court therefore did not allow the cooperative board’s vote terminating the shareholder’s tenancy to satisfy the RPAPL 711 (1) competent evidence standard necessary to obviate a court’s independent determination of objectionability. (See Kennedy at 950.) The Kennedy court for that reason did not decide whether Pullman applies only to shareholder votes. {See id. at 943.) Instead, the Kennedy court reached Pullman’s second prong: whether, assuming that a board has the power to terminate a tenancy, the shareholder-tenant’s conduct was objectionable. {See id. at 950.) In Kennedy, the court concluded that any decision on the shareholder-tenant’s objectionability required a trial. (See id. at 951.)
In this proceeding, as opposed to Kennedy, the board vote finding the shareholder-tenant objectionable was made validly, in good faith, and within the scope of the board’s authority. The court must accordingly determine whether a cooperative board has the authority to terminate a shareholder-tenant’s tenancy or whether a shareholder-tenant has the right to have a court rather than a board decide that question. This court must accord great weight to the Court of Appeals’ language in Pullman, *603 albeit dicta, that a board’s vote to terminate a proprietary lease must receive business judgment deference. The court finds, therefore, that the board’s vote to terminate respondent’s proprietary lease is dispositive. Thus, the court may not decide whether competent evidence of the shareholder-tenant’s alleged objectionable conduct exists to support the board’s terminating his tenancy under RPAPL 711 (1). In this case, the board’s vote itself provides that competent evidence. As such, summary judgment must be granted to petitioner cooperative.
II. The Facts
A. Petitioner’s Warnings to Respondent About His Behavior
Petitioner alleges that respondent has engaged in objectionable conduct for many years and has refused, despite written warnings required by paragraph 31 (f) of the proprietary lease, to abide by the cooperative’s rules of conduct.
On November 12, 1993, four months after respondent’s tenancy began, petitioner sent him a letter asking him to stop playing his stereo at an unreasonably loud volume level. (See petitioner’s notice of motion to dismiss respondent’s objections in point of law and for summary judgment, exhibit D.) On January 7, 1994, petitioner sent respondent a letter asking him to stop slamming his doors and playing his television and stereo loudly after 11:00 p.m. (Id.) On August 19, 1999, petitioner’s managing agent, the Insignia Residential Group, sent respondent a letter pleading with him to leave a copy of his key with the lobby attendant so that he could be let into his apartment when he locks himself out. (Id.) On March 29, 2000, Insignia sent respondent a letter to ask him to stop using the stairwell and hallway around his apartment to store his personal belongings. (Id.) In the same letter, Insignia warned respondent of the security risk he created when he rigged the second-floor stairwell doors to remain unlocked after they closed. (Id.) On October 11, 2000, petitioner’s lawyers sent respondent a letter to ask him to stop leaving his personal property in the common hallways, to stop his loud noises from 11:00 p.m. to 8:00 a.m., and, once again, to give petitioner a key to his apartment. (Id.) On June 30, 2003, petitioner sent respondent a letter banning him from the laundry room, health club, and sundeck because he allegedly stole from residents who used these facilities. (Id., exhibit H.)
Petitioner’s staff also lodged numerous complaints against respondent. For example, the building superintendent complained that respondent locked himself out of his apartment from two *604 to four times a month from 1997 to 1999, often requiring staff to open his door from 11:00 p.m. to 8:00 a.m. (See id., exhibit D.)
In addition to the behavior listed in the letters petitioner sent to respondent, petitioner alleges in its motion for summary judgment that respondent engaged in other objectionable conduct during the past 11 years. According to petitioner, respondent spray-painted furniture in the hallway and stairwell and left the furniture there to dry. (Id., affidavit of Nancy Frawley in support of petitioner’s summary judgment motion ¶ 8 at 3.) Petitioner contends that respondent allowed two fires to conflagrate in his apartment. (Id. ¶ 11 9 at 3.) Petitioner asserts that respondent had loud guests after hours and would get into loud fights with them. (Id.) Petitioner claims that one fight got so loud that the police had to restore order. (Id.) Petitioner also alleges that, while trying to unclog a neighbor’s drain, its workers were almost pricked by used hypodermic needles they unsuspectingly found in respondent’s sink drain. (Id.)
Respondent does not deny the objectionable conduct that petitioner alleges he committed. Thus, respondent does not deny that fires flamed in his apartment. In his affidavit in opposition, respondent contends simply that petitioner has not presented this court with objective evidence supporting the fires. (See respondent’s affidavit in opposition to petitioner’s motion for summary judgment ¶ 5 at 2.) Respondent does not deny that the police had to be called to restore order after a fight broke out among his guests and himself. Respondent points out only that petitioner has not given the court the police report from the incident. (Id.) Respondent denies knowing that syringes were in the drainpipes he shares with the neighbor, but does not deny that the syringes were his. (Id. ¶ 6 at 2.) Respondent simply expresses frustration that the building staff damaged his sink trap when they tried to unclog his neighbor’s sink and that petitioner never repaired the damage. (Id.)
B. Giving Respondent a Second Chance
On May 31, 2001, the board sent respondent a notice of objectionable conduct advising him that, if his disruptive behavior continued, it will consider terminating his lease. (Petitioner’s notice of motion to dismiss respondent’s objections in point of law and for summary judgment, exhibit E.) Specifically, the board asked him to stop obstructing the common hallways, creating loud disturbances after 11:00 p.m., using the public elevators instead of the service elevators to move furniture, and spray-painting furniture in the stairwells. (Id.) The board called *605 for a special meeting to be held on August 22, 2001 to decide whether respondent’s proprietary lease should be terminated. Paragraph 31 (f) of respondent’s proprietary lease allows petitioner’s board of directors to call a special meeting of the board to terminate a shareholder-tenant’s tenancy by an affirmative vote by two thirds of the directors. (Id., exhibit C, at H-34.) Respondent attended the August 2001 meeting and defended himself against the board’s charges of continued objectionable behavior. According to the minutes of the meeting, the board voted unanimously to terminate respondent’s tenancy for objectionable behavior. (See id., exhibit F.)
After the unanimous board vote, respondent implored the board to give him another chance to correct his behavior. The board agreed. As a condition of allowing respondent a final opportunity to stop his objectionable behavior, the board asked him to sign an agreement to acknowledge his past behavior and to agree to abide by the house rules.
Respondent signed the agreement on December 6, 2001. (Id., exhibit G.) He admitted a variety of conduct in the agreement: that he obstructed the common hallways of the building by leaving his bicycle and other equipment there, that he used the building’s laundry facilities to clean rugs and other items as part of his business, that loud noises regularly emanated from his apartment after 11:00 p.m., that he continually allowed his dog to roam the hallways without a leash, and that he roamed the public hallways semi-naked. (Id.)
According to petitioner, the December 2001 agreement did not result in a cessation of objectionable conduct. The board called a special meeting for September 2003 to decide once again whether to terminate respondent’s tenancy.
C. The Special Meeting of September 3, 2003
Petitioner alleged in a notice sent to respondent that he failed to comply with the December 2001 agreement to conform his conduct to the house rules. The notice told respondent that the board of directors had scheduled a special meeting to decide whether to terminate his proprietary lease. The notice informed respondent that he could bring an attorney to represent him at the meeting. The meeting took place in the apartment building on September 3, 2003. Attending the meeting were all eight members of the board of directors, petitioner’s attorney, a representative from Insignia, and respondent. Respondent chose not to seek counsel for the meeting. The board tape-recorded the meeting and later had the tape transcribed. The transcript *606 is 26 pages long, not including the board’s deliberations. (See petitioner’s reply affirmation, exhibit M.)
The special meeting was structured so that the board advised respondent of the behavior to which it objected and then the board gave respondent the opportunity to answer the allegations. The board first listed the behavior that respondent acknowledged in the December 2001 agreement. (See id. at 3-5.) The board then detailed the new items that the board accused respondent of committing. (See id. at 5-8.) The board at one point granted respondent’s request to adjourn the meeting for a few minutes so that he could get physical evidence to present to the board. (See id. at 23.) The board voted to terminate respondent’s tenancy after it gave him a full and fair opportunity to address all the allegations fully.
According to the board, respondent allowed his dog to run around without a leash at least eight times. (See id. at 5.) The board accused one of respondent’s guests of setting off an alarm on the roof of the building. (See id. at 5-6.) The board alleged that respondent continued to slam his doors and the stairwell door and that he created loud noises in his apartment at night. (See id. at 6.) The board informed respondent that a resident of the building called the police to report that he was harassing her. (See id.) The board further told respondent that two employees saw him on camera stealing another person’s laundry out of the laundry room. (See id. at 7-8.) The board then recounted the events of August 14, 2003, the night of the electrical blackout. According to the board, respondent that night set up a table in the hallway outside his apartment, lit candles, and continuously slammed his apartment door, waking up his neighbors. (See id.) The board additionally accused respondent of taking a homeless man with him to use the showers in the building’s health club on June 25, 2003. (See id. at 6-7.) The club attendant refused to admit respondent and his guest because respondent did not have valid passes to gain access to the health club. But respondent and his guest sneaked into the showers anyway, where they were allegedly seen having sexual relations together. (See id. at 7.)
The board let respondent try to refute the board’s claims and explain his conduct. Respondent chose to refute only some of the allegations. He took time to address one of the allegations he acknowledged in his December 2001 agreement. In that agreement, he admitted that he once walked through the public hallways in a state of undress. Respondent stated at the *607 September 2003 meeting that, although he had left his apartment wearing only a shirt and one sock, he did so unintentionally because he was sleepwalking. (See id. at 4.)
In response to the board’s allegations that he let his dog roam the public hallways without a leash, he stated that his dog is well behaved. (See id. at 8.) Respondent then argued that it was a mischaracterization to state that his dog roamed around, because the dog never left his floor. (See id. at 9.) Respondent also tried to explain the events of the August 2003 blackout. He stated that he had lit a candle in the hallway and needed several times to come out into the hallway to light another candle he had in his apartment so that he could see into his apartment. (See id. at 9-10.) Respondent claimed that he needed the candle in his apartment to place a leash on his dog to take it for a walk. (See id. at 9.) Respondent denied slamming his doors after 11:00 p.m. (See id. at 13.)
Respondent addressed the accusation that he stole from the laundry room. He explained that he found a jacket in a puddle in the laundry room and assumed that someone had thrown it away. (See id. at 11.) Respondent denied removing the jacket from the laundry room. (Id.) He said he left it hanging on a doorknob. (Id.)
Respondent spent a significant amount of time responding to the board’s accusation that he engaged in sexual relations in the health club’s shower. Respondent stated that he was entitled to use the showers. According to respondent, he had guest passes that he paid for. (See id. at 10-11.) Respondent explained that his homeless guest had a foul odor and needed to shower. (See id. at 10.) Respondent adamantly denied having sex with his guest in the shower. (See id. at 13.) Respondent admitted that they were naked in the same shower at the same time, but he explained that he was merely trying to free an ingrown hair from his guest’s back. (See id.)
To test respondent’s honesty, the board members halted the meeting so that he could go to his apartment to bring back the guest passes he used to gain access to the health club. (See id. at 22-24.) When respondent returned to the meeting with the passes, the board members inspected them and noted that they expired in 1994 (see id. at 24) and thus were invalid for admission to the health club. When a board member asked respondent why he did not shower with the homeless man in his apartment, he replied that his apartment was a mess and he did not want to bring a stranger near his dog. (See id. at 13.)
*608 The board listened to respondent’s explanations, arguments, and excuses but ultimately found them unpersuasive. The board unanimously passed a corporate resolution to terminate respondent’s tenancy. (See petitioner’s notice of motion to dismiss respondent’s objections in point of law and for summary judgment, exhibit I.) The resolution states that respondent’s proprietary lease is terminated for repeated instances of objectionable conduct after the board notified respondent in writing of its objection to his conduct. (Id.) On September 16, 2003, the board served a notice of termination on respondent stating that the board had unanimously voted to terminate his proprietary lease because he violated the agreement of December 6, 2001. (See id., exhibit J.) The notice of termination advised respondent that his lease would terminate on September 30, 2003. On October 24, 2004, petitioner commenced this holdover proceeding. Petitioner now moves for summary judgment.
III. Summary Judgment
Summary judgment will be granted if the movant establishes that no triable issues of fact exist. (See Andre v Pomeroy, 35 NY2d 361, 364 [1974].) Once the party seeking summary judgment shows entitlement, the party opposing the motion must come forward with admissible proof establishing the existence of triable issues of fact or demonstrate an acceptable excuse for its failure to do so. (Zuckerman v City of New York, 49 NY2d 557, 562 [1980].) When faced with a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party all the reasonable inferences that can be drawn from the evidence. (Negri v Stop & Shop, 65 NY2d 625, 626 [1985].)
The parties disagree about what petitioner must prove to prevail on summary judgment. Respondent argues that petitioner must prove to the court that he committed objectionable conduct. Petitioner argues that the board’s vote to terminate respondent’s tenancy is entitled to business judgment deference. Petitioner contends that it is unnecessary on this motion for summary judgment to prove that respondent engaged in the objectionable conduct. Petitioner contends that a valid board vote is all the proof of respondent’s objectionable conduct necessary to establish its case for possession. This court turns to the Court of Appeals Pullman decision for guidance.
IV The Pullman Decision
In 40 W. 67th St. v Pullman, a cooperative sought to recover possession from Pullman, a shareholder-tenant who engaged in *609 objectionable conduct that eventually led to the termination of his tenancy. (See 100 NY2d at 150.) Pullman sued his neighbors, called the police against his neighbors, altered his apartment without permission, distributed flyers in the building that accused a neighbor of being mentally unstable, and accused other neighbors of being unfaithful to their spouses. (Id. at 150-151.) The shareholders held a meeting to decide whether to pass a resolution ordering the board of directors to terminate Pullman’s tenancy. (Id. at 151-152.) At the meeting, shareholders representing a supermajority of the shares were present; Pullman did not attend. (Id. at 152.) The shareholders voted 2,048 shares to 0 to terminate Pullman’s tenancy. (Id.)
When Pullman did not vacate the apartment, the cooperative brought an ejectment action in Supreme Court based on the shareholder vote. Supreme Court denied the cooperative’s motion for summary judgment. (Id.) On appeal, the Appellate Division, First Department, reversed the Supreme Court’s decision and order denying petitioner’s motion for summary judgment. (See 40 W. 67th St. v Pullman, 296 AD2d 120 [1st Dept 2002].) The First Department held that the shareholders’ vote was entitled to deference under the business judgment rule. (See id. at 124.) Pullman appealed, and the Court of Appeals found for the cooperative. (See 100 NY2d at 158.)
The Pullman court relied heavily on Matter of Levandusky v One Fifth Ave. Apt. Corp. (75 NY2d 530 [1990]) to apply the business judgment rule to the cooperative’s decision. The Levandusky court applied that rule as the standard to review board votes in a CPLR article 78 proceeding that challenged a cooperative board’s decision to prevent a shareholder-tenant from renovating an apartment. (See 75 NY2d at 537-538.) The Pullman court’s reliance on Levandusky is noteworthy. Pullman extended Levandusky’s business judgment deference to eviction actions and proceedings.
The Pullman court held that courts should scrutinize the facts underlying a board’s decision if a shareholder-tenant can show that the cooperative acted (1) outside the scope of its authority, (2) in a way that did not legitimately further the corporate purpose, or (3) in bad faith. (See 100 NY2d at 155.) These three exceptions to the business judgment rule balance protecting the interests of the entire cooperative community and the judiciary’s interest in protecting against the board’s possible abuse of its broad powers to terminate a shareholder-tenant’s proprietary lease. (Id. at 154.) Absent proof of one or *610 all of the three exceptions, a shareholder vote to terminate a tenancy because of the shareholder-tenant’s objectionable conduct satisfies the “competent evidence” standard required by RPAPL 711 (1), entitling the cooperative to summary judgment. (100 NY2d at 155 [finding that “relationships among shareholders in cooperatives are sufficiently distinct from traditional landlord-tenant relationships” and that courts should not look behind proper board votes].)
The Pullman case established a two-phase process of reviewing a cooperative’s decision to terminate a shareholder’s tenancy. (Kennedy, 4 Misc 3d at 938.) In the first phase, the court must determine whether the cooperative’s action is entitled to business judgment deference. (Id.) If the business judgment rule applies, the court must grant summary judgment to the cooperative corporation if the cooperative moves for it, and, otherwise, must grant a final possessory judgment after trial without requiring the cooperative corporation to prove whether the shareholder-tenant is innocent or guilty of the purported objectionable conduct. It is the shareholder-tenant’s burden to show that the board vote is not entitled to deference. The shareholder-tenant will satisfy that burden by showing that the board’s actions were outside the scope of its authority, that the board’s actions did not further the cooperative’s corporate purpose, or that the board’s decision was made in bad faith. (Pullman, 100 NY2d at 155; Kennedy, 4 Mise 3d at 938.)
If the shareholder satisfies its burden, the court moves to phase two: an independent evaluation, from competent, admissible evidence, of whether the shareholder committed objectionable conduct. (Kennedy, 4 Mise 3d at 938.)
V Business Judgment Deference for Board Votes
The business judgment rule is a standard of reviewing business decisions that courts use to prevent judicial interference and second-guessing of corporate decisions made in good faith and in furtherance of the corporate purpose. (Levandusky, 75 NY2d at 537-538, citing Auerbach v Bennett, 47 NY2d 619, 629 [1979].) Courts have given business judgment deference to a wide range of cooperative board actions and decisions, although not yet to a vote to evict. (See e.g. Horwitz v 1025 Fifth Ave., Inc., 7 AD3d 461, 462 [1st Dept 2004, mem] [applying business judgment deference to cooperative house rule banning awnings]; Han Fui Hui v Tieh Chi Ho, 1 AD3d 274, 274 [1st Dept 2003, mem] [according deference to cooperative’s decision to issue and sell new shares of stock to parties other than plaintiff]; Konrad *611 v 136 E. 64th St. Corp., 254 AD2d 110, 110 [1st Dept 1998, mem] [deferring to cooperative board’s decision about repairs and renovations]; Glassmeyer v 310 Lexington Owners Corp., 232 AD2d 229, 230 [1st Dept 1996, mem] [applying deference to cooperative board’s refusal to reallocate shares]; Rubinstein v 242 Apt. Corp., 189 AD2d 685, 686 [1st Dept 1993, mem] [holding that shareholder could not challenge board’s adoption of rules expanding amount of time common roof garden was open]; Cannon Point N. v Abeles, 160 Misc 2d 30, 33 [App Term, 1st Dept 1993, per curiam] [applying deference to cooperative board’s decision to prohibit washing machines and dryers in individual units].)
The issue in this case is whether a board vote terminating a shareholder-tenant’s proprietary lease is entitled to business judgment deference. The Court of Appeals Pullman decision and this court’s decision in Kennedy have engendered discussion about the advisability of allowing a board vote to terminate a shareholder-tenant’s tenancy as opposed to requiring a full shareholder vote. (See e.g. Richard Siegler, A Failure to Follow Procedure, 205 Habitat Mag 51 [Oct. 2004] [analyzing Kennedy and Pullman].)
Some commentators support extending business judgment deference to board votes to terminate tenancies for objectionable conduct. (See Menachem J. Kastner and Jarred Kassenoff, Re-Examining ‘Pullman’: The Threshold Dilemma, NYLJ, Sept. 15, 2004, at 4, col 4 [hereinafter The Threshold Dilemma] [discussing Kennedy and arguing that board votes to terminate tenancies are entitled under Pullman to same deference as shareholder votes]; accord Menachem J. Kastner and Jarred I. Kassenoff, Cooperatives Authorized to Use Business Judgment Rule in Terminating Shareholder Leases, 75 NY St BJ 32, 38 [July/Aug. 2003].) Those who support extending business judgment deference to board votes argue that no principled ground distinguishes shareholder votes from board votes. (See e.g. The Threshold Dilemma, supra at 4, col 4.) In this regard, some contend that boards that follow the cooperative’s procedure Eire entitled to business judgment deference. {See e.g. Kenneth J. Finger and Carl L. Finger, Pullman Revisited — Examining An Important Realty Ruling, 3 Impact: Building & Realty News 2 [Sept./Oct. 2004] [discussing Kennedy and advising cooperative boards to follow proper voting procedures, to review notices scrupulously, and to afford fundamental.fairness to shareholder-tenants whose tenancy the board is considering terminating].)
*612 Other commentators have voiced, concerns about allowing only a board vote to terminate a shareholder’s tenancy. (See e.g. Scott E. Mollen, Realty Law Digest, NYLJ, Oct. 6, 2004, at 5, col 1 [analyzing Kennedy and arguing that giving cooperative boards too much power might diminish value of cooperatives and make getting a mortgage for them much more difficult].) In Kennedy itself, this court noted that those who oppose granting business judgment deference to board votes are ultimately concerned with eroding tenant protection. (See Kennedy, 4 Misc 3d at 940-941, citing John Caher, Co-op Boards Given Broad Power to Evict: Business Judgment Rule Applies to Terminations, NYLJ, May 14, 2003, at 1, col 3; Joel E. Miller, Court of Appeals Holds Courts Powerless to Review Cooperative’s Factual Findings, 32 NY Real Prop LJ [No. 1] 4, 8 [2004]; Vincent Di Lorenzo, The Business Judgment Rule and Fiduciary Obligations Are Applied to Shareholder Decisions in Cooperative Housing Corporations, 32 NY Real Prop LJ [No. 1] 10 [2004]; Stewart E. Sterk, Jurisprudence Taking Shape on Facts and Law, NYLJ, Sept. 2, 2003, at S10, col 1].)
Pullman is a shareholder case, not a board case. The Court of Appeals’ statements about granting business judgment deference to board votes were not directly related to the issue before the Pullman court. They are dicta. (Kennedy, 4 Misc 3d at 939.) But this court must follow the Court of Appeals’ dicta in Pullman. Any statement, explanation, rationale, or observation not directly related or necessary to the outcome of the particular dispute before a court is not binding precedent. (See Ruggero J. Aldisert, Precedent: What It Is and What It Isn’t; When Do We Kiss It and When Do We Kill It?, 17 Pepp L Rev 605, 607 [1990] [noting that a case is important only for what was decided and not for how it was decided]; Richard B. Cappalli, What Is Authority? Creation And Use of Case Law by Pennsylvania’s Appellate Courts, 72 Temp L Rev 303, 320 [1999] [stating that court’s decision on material facts combined with legal principles being applied is holding, but court’s rationale helps readers understand breadth of holding]; Arthur L. Goodhart, Determining the Ratio Decidendi of a Case, 40 Yale LJ 161, 162 [1930] [arguing that judge’s reason for decision is never binding part of precedent].) Dicta or no, however, the Court of Appeals’ reasoning in Pullman applies here and is persuasive.
The court from which the dicta comes is an important consideration when deciding what weight to give the dicta. In this case, the source of the dicta is the highest court in New *613 York State. A unanimous decision containing dicta is also more persuasive than an opinion that generates concurring or dissenting opinions. In Pullman, the Court of Appeals stated unanimously that board votes are entitled to deference under the business judgment rule. The number of times a court states a rule affects whether the dicta is a casual remark. In deciding that shareholders’ votes to terminate a shareholder’s tenancy are entitled to deference, the Court of Appeals referred 14 times to granting deference, under the business judgment rule, to proper board votes to terminate tenancies. Lower courts must consider nonbinding statements from a jurisdiction’s highest court to be a prophecy about what the law is. (McCalla v Royal MacCabees Life Ins. Co., 369 F3d 1128, 1132 [9th Cir 2004] [treating United States Supreme Court dicta as “prophecy” on how it will decide future cases].) The Pullman dicta are a prophecy from the Court of Appeals that board votes to terminate a shareholder-tenant’s tenancy are entitled to deference.
Courts ought not ignore an in-depth evaluation by the Court of Appeals. (See Florsheim Shoe Store Co. v Retail Shoe Salesmen’s Union of Brooklyn & Queens, 47 NYS2d 772, 777 [Sup Ct, Kings County 1944] [stating that lower courts cannot ignore Court of Appeals’ thorough evaluations of an issue].) The Pullman court recognized that cooperative shareholders voluntarily share control over who lives in the cooperative community. (See Pullman, 100 NY2d at 158.) The Pullman court also recognized that the board represents the interests of the collective. (See id. at 154 [quoting Levandusky that boards protect cooperative community’s interests].) The Pullman court recognized the concerns of limiting judicial review of board decisions, but the Court articulated with unambiguous clarity that procedurally proper cooperative board votes that terminate a shareholder’s tenancy for objectionable conduct are entitled to deference under the business judgment rule. (See id. at 153-154, 158 [noting that courts must exercise “heightened vigilance” when faced with board votes to terminate proprietary leases].) Allowing boards to terminate cooperative tenancies might affect the value of cooperatives. But cases cannot be decided on market forces. Market forces have no force of law. The court must apply the Court of Appeals’ reasoning in deciding petitioner’s motion for summary judgment.
VI. Notice of Objectionable Conduct
Petitioner’s motion to dismiss respondent’s first, second, and third objections in point of law is granted. Respondent does not *614 suggest that the board’s decision was outside the scope of the board’s authority, that the vote was invalid, or that the vote was made in bad faith, and the court on its own review has found none of that. Respondent instead raises three defenses. Respondent argues in his first objection in point of law that this court lacks subject matter jurisdiction because, he claims, petitioner failed properly to allege the facts of this cause of action. Respondent in his second objection in point of law argues the petition should be dismissed because, he claims, petitioner did not adequately specify the alleged objectionable behavior in the termination notice. Respondent argues in his third objection in point of law that the allegations in the termination notice do not constitute a nuisance.
The court rejects these defenses. Petitioner has sufficiently stated a cause of action. The termination notice specified the alleged behavior; it listed, in detail, respondent’s objectionable conduct and annexed the December 2001 agreement. The allegations, if true, constitute objectionable conduct by any fair definition. In any event, the board vote is competent evidence of respondent’s objectionable behavior. (See Pullman, 100 NY2d at 155.) Whether allegations of objectionable conduct contained in and annexed to a termination notice are specific enough to enable a respondent to mount a defense to allegations of misconduct is relevant only if a board’s vote is entitled to no deference.
Paragraph 31 (f) of the proprietary lease allows a cooperative corporation to terminate a proprietary lease if a shareholder-tenant continues to commit objectionable conduct after the shareholder receives written notice of objectionable conduct. The specificity of the allegations in the termination notice in question are relevant, therefore, in a context that respondent never argued. A termination notice must be specific so that a court may compare the allegations in the initial written notices complaining about objectionable conduct with the allegations in special meeting notice accusing the shareholder of engaging in the conduct again and with the allegations in and annexed to the termination notice. A comparison is necessary to ensure that the shareholder has notice before a special meeting of the alleged objectionable conduct that might form the basis to terminate a proprietary lease. Having that notice assures due process and an opportunity to defend. A comparison is also necessary to ensure that the board voted on the same repeated misconduct about which the shareholder had received prior written notice.
*615 Here, petitioner sent respondent numerous written notices about his objectionable conduct asking him to correct his behavior. The termination notice annexes the December 2001 agreement, which lists respondent’s conduct, which in turn was the subject of the September 2003 special meeting. Thus, the termination notice specifies the repeated objectionable conduct that was the subject of the corporate resolution and about which respondent was previously warned in writing, all as required by paragraph 31 (f) of the proprietary lease and all as required by a strict reading of Pullman’s heightened vigilance standard.
VII. Conclusion
Petitioner’s motion for summary judgment is granted. This court is under a directive from the Court of Appeals to ensure the good faith of cooperative decisions to terminate a shareholder’s tenancy. (See id. at 157 [warning courts that business judgment deference may not be used to rubber-stamp board’s decision].) But the board’s decision is entitled to business judgment deference, even construing all the facts in favor of respondent, the nonmoving party.
A properly elected board acted within its authority and according to the proprietary lease to terminate respondent’s tenancy. The board gave respondent proper notice of its proposed action. The board provided respondent with a forum to dispute the claimed objectionable behavior. After respondent acknowledged his behavior in writing and agreed to change, the board gave respondent one more last chance to conform his conduct to the cooperative community’s standards. When he failed to comply with the agreement, the board gave him another notice of objectionable conduct and asked him to appear for a special meeting. With that notice and an opportunity to be heard, respondent appeared and defended himself against the board’s allegations. The board listened but found him unconvincing. After unanimously voting to terminate his tenancy, following a hearing fully transcribed to assure that the board would act with integrity, the board passed a corporate resolution and sent respondent a notice to terminate his tenancy. Here, as in Pullman, the “cooperative unfailingly followed the procedures contained in the [proprietary] lease ... to terminate [respondent’s] tenancy.” (Id. at 156.) Petitioner is entitled to judgment on the papers.
Final judgment for petitioner.